UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) |
| FERRELLGAS, INC., | ) |
| | ) |
| Defendant. | ) |

COMPLAINT

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges as follows:

NATURE OF THE ACTION

1. This is a civil action for civil penalties pursuant to Section 113(b) of the Clean Air Act ("Act"), 42 U.S.C. § 7413(b), against Defendant Ferrellgas, Inc., doing business as Blue Rhino ("Blue Rhino" or "Defendant"), for violations of the General Duty of Care imposed by Section 112(r)(1) of the Clean Air Act, 42 U.S.C. § 7412(r)(1), with respect to a facility at 300 County Road 448, Tavares, Florida (the "Facility").

1

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b).

3. Venue is proper in this District under Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the Defendant does business in and the claims arose in this judicial district.

## THE DEFENDANT

4. The Defendant is a Delaware corporation with its principal place of business in Overland Park, Kansas.

5. The Defendant is a retail marketer of propane in the United States and a provider of propane via cylinder exchange programs under the "Blue Rhino" brand. The Defendant conducts its business at the Facility under the Blue Rhino name.

6. The Defendant is a "person" within the meaning of Section 302(e) of the Clean Air Act, 42 U.S.C. § 7602(e).

## STATUTORY AND REGULATORY FRAMEWORK

7. In 1990, Congress added Section 112(r) to the Clean Air Act, *see* Pub. L. 101-549 (Nov. 15, 1990), in response to a 1984 catastrophic release of methyl isocyanate in Bhopal, India that resulted in 3,400 fatalities, 200,000 injuries, and

damage to property. S. Rep. No. 101-228 (Dec. 20, 1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3519. The objective of Section 112(r) of the Clean Air Act, and its implementing regulations, is "to prevent the accidental release and to minimize the consequences of any such release" of any extremely hazardous substance. 42 U.S.C. § 7412(r)(1).

8. "Extremely hazardous substances" include, but are not limited to, substances listed pursuant to Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3), at 40 C.F.R. § 68.130, and chemicals on the list of extremely hazardous substances published under Section 302 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11002, at 40 C.F.R. Part 355, Appendices A and B. An extremely hazardous substance is any chemical which may, as a result of short-term exposures because of releases to the air, cause death, injury or property damage due to its toxicity, reactivity, flammability, volatility or corrosivity. S. Rep. No. 228, 101st Cong., 1st Sess. 211 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3519.

9. The term "accidental release" is defined by Section 112(r)(2)(A) of the Clean Air Act, 42 U.S.C. § 7412(r)(2)(A), as "an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source."

10. Section 112(r)(1) of the Clean Air Act, 42 U.S.C. § 7412(r)(1), mandates three distinct general duty of care requirements for owners and operators of stationary sources producing, processing, handling or storing specific hazardous substances, including extremely hazardous substances. In pertinent part, Section 112(r)(1) provides:

> It shall be the objective of the regulations and programs authorized under this subsection to prevent the accidental release and to minimize the consequences of any such release of any substance listed pursuant to paragraph (3) or any other extremely hazardous substance. The owners and operators of stationary sources producing, processing, handling or storing such substances have a general duty in the same manner and to the same extent as Section 654 of Title 29 [29 U.S.C. § 654)] to identify hazards which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur.

42 U.S.C. § 7412(r)(1) (hereinafter the "General Duty Clause" or "General Duty of Care").

11. The term "stationary source" means "any buildings, structures, equipment, installations or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons under common control), and (iv) from which an accidental release may occur." 42 U.S.C. § 7412(r)(2)(C).

12. Pursuant to the General Duty Clause, an owner/operator of a stationary source has a general duty to (1) identify hazards which may result from accidental releases of extremely hazardous substances, using appropriate hazard assessment techniques; (2) design and maintain a safe facility, taking such steps as are necessary to prevent accidental releases of extremely hazardous substances; and (3) minimize the consequences of accidental releases of extremely hazardous substances.  These duties are known as the first, second, and third prongs of the General Duty Clause, respectively.

13. Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), provides that the Administrator of EPA shall, in the case of a person that is the owner or operator of a major stationary source, and may, in the case of any other person, whenever such person violates any requirement or prohibition of Subchapter I of the Act (42 U.S.C. §§ 7401-7515), commence a civil action for injunctive relief and to assess and recover a civil penalty of up to $25,000 per day for each such violation.

14. Under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 ("DCIA"), and pursuant to EPA's Civil Monetary Penalty Inflation Adjustment Rule at 40 C.F.R. Part 19, promulgated pursuant to the DCIA, the maximum amount of the civil penalties provided under Section 113(b) of the Clean

Air Act was increased to $37,500 per day for each violation occurring from January 12, 2009 through November 2, 2015. After November 2, 2015, the maximum penalty amount per day for each violation is $101,439, depending on the date when penalties are assessed. 85 Fed. Reg. 1751, 1756 (January 13, 2020).

## GENERAL ALLEGATIONS

15. Blue Rhino sells liquid propane in 20-pound (3.5 gallon) metal cylinders. The cylinders are available at retail locations where customers exchange empty tanks for a refilled Blue Rhino brand cylinder for a fee. The Facility refills empty cylinders and returns the refilled cylinders to the retail locations.

16. Cylinders waiting to be refilled and refilled cylinders are stored in pallets at a four to five acre asphalt yard located behind the production buildings at the Facility. Blue Rhino uses permanent, full-time employees and temporary contract employees at the Facility, including in the yard.

17. Blue Rhino uses a standardized process to refill cylinders. All returned cylinders are first inspected inside the production building for damage or defects, including paint damage. Cylinders that need no additional work are sent directly to be refilled and restacked in the yard on pallets for distribution to retail locations. Most of the cylinders need no additional work and can be refilled without repair or repainting.

18. Empty cylinders needing additional work, such as valve replacement or painting, must be emptied of any residual liquid propane before the work can be done. At the Facility, such tanks are sent to an automated propane removal system ("APRS") station inside an explosion proof building where cylinders are placed upside down for removal by gravity of any remaining liquid propane through an opened valve on the cylinder.

19. If the cylinder valve is defective, however, and it is not possible to open the valve to remove any remaining liquid propane through the APRS, a bleeder screw on the valve can be opened by screwdriver to allow for evacuation of the remaining propane without use of the APRS. When loosened by a screwdriver, the bleeder screw allows propane to vent into the atmosphere.

20. In 2013, Blue Rhino employees identified several pallets of refilled cylinders in the yard that included some cylinders with paint blemishes. These pallets were segregated at one location in the yard. Blue Rhino planned to repaint the cylinders with paint defects, which required that the cylinders first be emptied of liquid propane.

21. On the night of July 29, 2013, the painting system for the Facility needed repair and operations at the plant came to a halt.

22. To save time on the removal of the liquid propane from the cylinders with

blemished paint, four Facility workers began opening the bleeder screws on all of those cylinders at the same time, venting the propane to the atmosphere. The workers intended to open the bleeder valves and leave for the night.

23. A forklift was directed to the area to retrieve the pallets. The forklift arrived and turned off the engine. Upon restarting the forklift, a spark from the ignition system ignited vented propane causing a fire.

24. The heat from the fire caused the propane in other cylinders to expand, causing the pressure relief valves in those cylinders to open, releasing additional propane. This added fuel to the fire and led to a chain reaction and explosions.

25. Cylinders were propelled into the air and fell on the Facility and the surrounding area through a series of explosions. Flames grew as high as 200 feet. At the time, the yard contained approximately 79,696 propane cylinders, including approximately 38,052 refilled cylinders, some of which released propane and added to the fire/chain reaction explosion.

26. Five workers were severely injured, and one suffered minor injuries as a result of the accidental release. Four of the severely injured workers were hospitalized with second-degree and third-degree burns, and were comatose for approximately two months.

27. The release resulted in approximately $3.5 million in property damage,

including damage to six businesses and one residence.

28.   The propane distribution business recognizes industry standards designed to prevent accidental releases of hazardous materials, including explosions. The National Fire Protection Association ("NPFA") publishes such industry standards. NFPA 58 requires written operating procedures for all aspects of liquid propane gas transfer, as appropriate for a facility, and must include detail on operator actions to be taken if flammable concentrations of flammable liquids or gases are detected in the facility using fixed detectors, portable detectors, operating malfunctions, or the human senses.

29.   Operating procedures ("Standard Operating Procedures" or "SOPs") provide employees specific information on how to conduct the operations they are required to do as part of their jobs. These include preconditions, health hazards, and personal protective equipment, if required. There should be verification that operating procedures are being followed, either by formal audits or informal observation of operations.

30.   In addition, NFPA 58 requires training to prevent releases and explosions. Along with initial training requirements, NFPA 58 requires refresher training at least every 3 years.

31.   At all relevant times, the Defendant owned and operated the Facility.

32. The buildings, structures, equipment, installations and substance emitting stationary activities from which an accidental release might have occurred belonged to the same industrial group, were located on one contiguous property, and were under the control of Blue Rhino. Therefore, the Facility is and was a "stationary source" within the meaning of Section 112(r)(2)(C) of the Clean Air Act, 42 U.S.C. § 7412(r)(2)(C).

33. The Facility processes, handles, and stores propane, an extremely hazardous substance within the meaning of Section 112(r)(1) of the Clean Air Act, 42 U.S.C. §§ 7412(r)(1).

34. Releases of propane to the air can cause death, injury or property damage due to its flammability. Propane is therefore an extremely hazardous substance.

35. At the time of the explosion, the Defendant had no SOPs expressly prohibiting employees from venting propane cylinders, including in the yard and including when the APRS was not used for any reason.

36. At the time of the explosion, the Defendant had no SOPs on how to handle leaking cylinders, including in the yard.

37. At the time of the explosion, the Defendant had inadequate training on whether or how to vent propane cylinders, including in the yard and including when the APRS is not functioning for any reason.

38. At the time of the explosion, the Defendant did not have adequate training on how to properly handle accidental leaks from cylinders, including where to take such leaking cylinders and how to minimize any adverse consequences from such accidental leaks.

39. At the time of the explosion, the Defendant had inadequate training on how a propane explosion might occur when propane is vented simultaneously from numerous cylinders, including the chain reaction that can result from even one localized fire.

40. At the time of the explosion, the Defendant had not adequately identified hazards in the yard which may result from the release of propane using appropriate hazard assessment techniques.

## FIRST CLAIM FOR RELIEF
(Section 112(r) Violations—Failure to Maintain Safe Facility)

41. Paragraphs 1 through 40 are re-alleged and incorporated by reference.

42. Pursuant to the General Duty of Care, at all relevant times, the Defendant had a duty to maintain a safe facility under Section 112(r)(1). To comply with this statutory duty, the Defendant had a duty to maintain and implement SOPs at the Facility. These operating procedures were necessary to ensure workers safely conducted operations involving extremely hazardous substances such as propane.

43. During all relevant time periods, the Defendant failed to have or


implement SOPs regarding venting of propane, including in the yard and when the APRS was not used for any reason, in a manner that would ensure safe operation of the Facility, including to prevent a fire, an explosion and a chain reaction.

44. During all relevant time periods, the Defendant failed to have or implement SOPs regarding the handling of leaking cylinders, including in the yard.

45. The Defendant has modified its SOPs since the incident to comply with the General Duty of Care.

46. Defendant's failure to have SOPs was a violation of the General Duty of Care under Section 112(r)(1) of the Clean Air Act, 42 U.S.C. § 7412(r)(1).

47. In addition, to comply with the statutory duty to maintain a safe facility, pursuant to NFPA 58, the Defendant had to conduct adequate training. Prior to the release in July 2013, the Defendant did not adequately train employees on the basic nature of liquid propane gas and how if accumulated in large quantities, even in an open yard, the propane gas could explode from a spark such as from the operation of a forklift and cause a chain reaction. The training that the Defendant did have explained that employees might be burned, but did not explain the risk of an explosion, including a chain reaction from pressure relief valves releasing additional propane. The Defendant's training also failed to adequately explain whether or how to vent cylinders or to handle leaking cylinders, in the yard or otherwise.

48. On information and belief, had the individuals involved in the incident on the night of July 13, 2013, been properly trained, they would not have released a large amount of propane gas through the bleeder screws in the yard.

49. The Defendant has modified its training practices since the incident to comply with the General Duty of Care.

50. Defendant's failure to have proper training was a violation of the General Duty of Care under Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1).

51. Pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), Defendant is liable for civil penalties to be assessed by the Court for each day of violation and not to exceed the statutory maximum.

## SECOND CLAIM FOR RELIEF
(Section 112(r) Violations—Failure to Analyze Hazards)

52. Paragraphs 1 through 51 are re-alleged and incorporated by reference.

53. Pursuant to the General Duty of Care, Defendant had a duty to identify hazards which may result in accidental releases of extremely hazardous substances such as propane, using appropriate hazard assessment techniques.

54. Defendant had not adequately identified hazards in the yard which may result from the release of propane using appropriate hazard assessment techniques.

55. The Defendant has conducted a Process Hazard Analysis of the yard since the incident to comply with the General Duty of Care.

56. Defendant's failure to have conducted a proper analysis of hazards was a violation of the General Duty of Care under Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1).

57. Pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b) Defendant is liable for civil penalties for each day of violation, and not to exceed the statutory maximum.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States prays that the Court:

1. Enter judgment against the Defendant and in favor of the United States, for a civil penalty for all violations to be determined by the Court within the statutory maximum;

2. Award court costs to the United States; and

3. Grant such other relief as this Court deems just and proper.

        Respectfully submitted,

        FOR THE UNITED STATES

        *s/ Ellen M. Mahan*
        ELLEN M. MAHAN
        Deputy Section Chief
        Environmental Enforcement Section
        Environment and Natural Resources Division
        U.S. Department of Justice

        *s/ James R, MacAyeal*
        JAMES R. MacAYEAL
        Senior Counsel
        Environmental Enforcement Section
        United States Department of Justice
        P.O. Box 7611
        Washington, DC 20044-7611
        jamie.macayeal@usdoj.gov

        MARIA CHAPA LOPEZ
        United States Attorney
        Middle District of Florida

        */s/ Lacy R. Harwell, Jr.*
        LACY R. HARWELL, JR.
        Assistant United States Attorney
        Florida Bar No. 714623
        Office of the United States Attorney
        For the Middle District of Florida
        400 N. Tampa St., Suite 3200
        Tampa, Florida  33602
        Tel. (813) 274-6000
        Fax (813) 274-6200
        Randy.Harwell@usdoj.gov

OF COUNSEL:

ERIC TRIPLETT
Associate Regional Counsel
Office of Regional Counsel
United States Environmental Protection Agency, Region 4
61 Forsyth Street, SW
Atlanta, Georgia  30303-8960